IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH RALSTON, | ) | CASE NO. 1:13CV1307 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Kenneth Ralston ("Plaintiff" or "Ralston") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for supplemental social security income ("SSI") and disability insurance benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 15.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

### I.  Procedural History

Ralston filed his applications for SSI and DIB on May 5, 2010, alleging a disability onset date of March 14, 2008.  Tr. 146-147, 148-151.  He alleged disability based on "heart trouble; busted vein in intestines, [and] bleeding ulcer."  Tr. 190.  After denials by the state agency initially (Tr. 77-79) and on reconsideration (Tr. 79-80), Ralston requested a hearing.  Tr. 31-32.  A hearing was held before Administrative Law Judge Ben Barnett ("ALJ") on February 14, 2012.  Tr. 33-76.

In his February 24, 2012, decision, the ALJ determined that Ralston is capable of performing his past relevant work as a security guard and, therefore, is not disabled.  Tr. 22.  The ALJ also determined that, in the alternative, there are jobs existing in the national economy that Ralston can perform.  Tr. 23.  Ralston requested review of the ALJ's decision by the Appeals Council. Tr. 10-11.  On May 6, 2013, the Appeals Council denied Ralston's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A. Personal and Vocational Evidence

Ralston was born in 1955 and was 56 years old on the date of the ALJ's decision.  Tr. 146.  Ralston completed two years of college.  Tr. 191.  He worked in the past as a corrections officer (Tr. 40-41), a security guard (Tr. 43), and in a security supervisory job (Tr. 59).  Tr.197-208.  He has not worked since 2008, after he was laid off from his most recent position as a security officer.  Tr. 42-43, 190.

### B. Relevant Medical Evidence

Prior to the alleged disability onset date, Ralston had undergone at least two cardiac catheterizations.[1]  Tr. 252, 315.  In March 2010, Ralston presented to the emergency room of St. John West Shore Hospital complaining of chest pains and left arm pain.  Id.  Ralston was diagnosed with dilated cardiomyopathy,[2] moderate coronary atherosclerosis, hypertension, chronic left branch block, and hyperlipidemia.  Tr. 253.   It was recommended that Ralston

---

[1] Treatment notes from January 2010 indicate that Ralston had undergone two heart catheterizations.  Tr. 315.  In March 2010, it was reported that Ralston had undergone four heart catheterizations, the last one in 2002.  Tr. 252.  In December 2010 treatment notes, it was noted that Ralston's last catheterization occurred in 2004.  Tr. 410.

[2] Cardiomyopathy:  a general diagnostic term designating primary noninflammatory disease of the heart muscle, often of obscure or unknown etiology and not the result of ischemic, hypertensive, congenital, valvular, or pericardial disease.  Pg. 294.

2

completely abstain from smoking and drinking; follow a low-fat diet; and take lisiniprol, Lipitor, and Ecotrin daily.  Tr. 253.  Shortly thereafter, Ralston presented to his primary care physician, Mohammed S. Khan, M.D., complaining of chest pain.  Tr. 307-08.  Dr. Khan referred Ralston to cardiologist Kara Quan, M.D., for consideration of an internal cardiac defibrillator ("ICD") device.  Tr. 308.

On April 26, 2010, Ralston was admitted to Elyria Memorial Hospital for surgery with Dr. Quan to implant an ICD device.  Tr. 275. 297-300.  Upon admission, Ralston was diagnosed with non-ischemic cardiomyopathy and was found to be in New York Heart Association's (NYHA's) functional class III, stage C heart failure.[3]  Tr. 275.  The following day, Ralston was discharged as stable and it was noted that Ralston has "no active chest disease."  Id.; Tr. 352.

In May 2010, Ralston returned to Dr. Khan, complaining of dizziness.  Tr. 292, 525.  Dr. Khan noted that Ralston's congestive heart failure and hypertension were under control.  Id.  Dr. Khan also noted that Ralston's cardiomyopathy with poor ejection fraction was stable as was his status post ICD and permanent pacemaker placement.  Id.  On August 6, 2010, Ralston returned to Dr. Quan's office and at that visit was reported to be in NYHA class II, stage B heart failure.[4]

---

[3] The NYHA functional classes are numbered from I to IV, with Class I being the mildest, meaning no functional limitations with ordinary physical activity. Class II means "slight limitations of physical activity. Comfortable at rest but ordinary activity results in fatigue, palpitation or dyspnea".  Class III means "marked limitation of physical activity. Comfortable at rest but less than ordinary activity causes fatigue, palpitation, or dyspnea". Class IV implies that a person has symptoms even at rest.

"Stage B" refers to objective evidence of minimal cardiovascular disease. Mild symptoms and slight limitation during ordinary activity. Comfortable at rest.

"Stage C" refers to the objective assessment of heart failure. Stage C is defined as "Objective evidence of moderately severe cardiovascular disease. Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest"  Source: American Heart Association website, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last viewed 7/31/2014).

[4] See prior footnote.

Tr. 513.  Ralston reported that he was easily fatigued but denied complaints of chest pain, palpitations, dizziness, lightheadedness, or shortness of breath.  Id.

In July 2010, Ralston underwent a band ligation procedure for treatment of a bleeding internal hemorrhoid.  Tr. 368.  In December 2010, Ralston again complained of rectal bleeding and had a colonoscopy.  Tr. 402, 485.  During the procedure internal hemorrhoids were again noted and a small polyp was removed.  Id.  It was noted in January 2011 that the bleeding had stopped.  Tr. 476.

Prior to his December 2010 colonoscopy, Ralston returned to Dr. Khan complaining of rectal bleeding.  Tr. 485.  It was noted that Ralston experienced no chest pain or shortness of breath.  Id.  However, that same day, Ralston again presented to St. John Medical Center complaining of intermittent chest pain and shortness of breath.  Tr. 487.  Ralston was thought to have atypical chest discomfort and it was noted that he had normal coronary arteries with a normal stress test earlier that year.  Tr. 488.  He was advised to continue on his current medications, lose weight, and quit smoking.  Tr. 495-96.  On January 31, 2011, Ralston was diagnosed with bronchitis and prescribed Amoxicillin.  Tr. 476.  On February 16, 2011, Ralston presented to Dr. Khan complaining of shortness of breath on exertion, dizziness, and back pain. Tr. 474.

On April 13, 2011, Ralston was admitted to Elyria Memorial Hospital with complaints of chest pain and lightheadedness.  Tr. 554, 557.  His chest pain improved by taking nitroglycerin. Tr. 554.  Ralston's blood pressure was recorded as high.  Tr. 557.  Ralston was discharged that day and advised to follow up with Dr. Khan.   Tr. 559.  On April 18, 2011, Ralston presented to Dr. Quan reporting that he slipped and fell down four steps.  Tr. 608.  He said that he was subsequently in the hospital for chest pain and that he had "a contusion but no fractures."  Id.

Dr. Quan stated that "Overall, [Ralston] is able to do whatever activity he wants without any significant symptoms" but that "[i]f he does heavy exertion, he may become short of breath."  Id. On April 28, 2011, Ralston returned to Dr. Khan complaining of low back pain.  Tr. 565.  After an X-ray, it was determined that there was no evidence of acute injury and little degenerative disease.  Id.  In May 2011, Ralston complained of shortness of breath on exertion which Dr. Khan stated as "chronic, of NYHA class III."  Tr. 602.  In June 2011, Ralston presented to Dr. Khan complaining of chest discomfort.  Tr. 595.  Dr. Khan stated that Ralston's symptoms were consistent with "noncardiac chest pain."  Tr. 596.  Anti-inflammatory medications were recommended.  Id.  Dr. Khan also noted that Ralston has suffered from chronic dizziness which improved after Ralston adjusted dosing of his medications.  Id.  In September 2011, Ralston reported no chest pain and no shortness of breath.  Tr. 591.  That same month, Ralston reported that he was to be given an epidural shot for his low back pain which was expected to resolve that issue.  Tr. 593.  On October 31, 2011, it was reported that Ralston's back and neck pain has improved.  Tr. 655.  On January 30, 2012, Ralston presented for a follow-up evaluation of his ICD.  Tr. 705.  He denied complaints of chest pain, palpitations, dizziness, lightheadedness, or shortness of breath.  Id.  He stated he is easily fatigued due to his "deconditioned state."  Id.

### C.  Opinion Evidence

<u>Dr. Khan.</u>  On February 16, 2011, Dr. Mohammad Khan completed both a physical and a mental medical source statement on Ralston's behalf.  Tr. 550-53.  In his physical medical source statement, Dr. Khan opined that Ralston's ability to lift/carry was limited due to his heart condition and that Ralston could stand and/or walk for 2 hours in an 8-hour work day due to shortness of breath.  Tr. 550.  Dr. Khan further opined that Ralston could rarely/never climb, crouch, kneel and craw and could only occasionally balance or stoop.  Id.  Dr. Khan stated that,

5

due to Ralston's cardiomyopathy Ralston could rarely/never push, pull, or perform gross manipulation and could occasionally reach, handle, feel, and perform fine manipulation. Tr. 551. Dr. Khan also determined that it was necessary to restrict Ralston's exposure to heights, moving machinery, temperature extremes, chemicals, dust, noise, and fumes due to his impairment. Id. In his mental medical source statement, Dr. Khan opined that Ralston could not maintain regular attendance and punctuality. Tr. 552. Dr. Khan further determined that Ralston had a poor ability to function independently without special supervision and to deal with workplace stresses.[5] Id. In support of his mental health findings Dr. Khan stated only that Ralston "has poor ejection traction [due to] cardiomyopathy restricting any work." Tr. 553.

<u>State Agency Review.</u>  On July 4, 2010, Nick Albert, M.D., state agency consultant, reviewed the evidence of record and opined that Ralston could frequently climb stairs and ramps, balance, crouch, and kneel; could occasionally stoop and crawl; and could never climb ladders, ropes, or scaffolds. Tr. 360. Dr. Albert further opined that Ralston did not suffer from any manipulative limitations including reaching, handling, fingering, and feeling. Tr. 361. Dr. Albert determined that Ralston should avoid concentrated exposure to vibration, fumes, odors, dusts, gases, and poor ventilation. Tr. 362.

On November 23, 2010, Diane Manos, M.D., affirmed the opinion of Dr. Albert. Tr. 392.

**D. Testimonial Evidence**

   **1.     Ralston's Testimony**

At the administrative hearing, Ralston was represented by counsel and testified that he resigned from his job as a corrections officer in 2004 due to internal bleeding and his heart

---

[5] Dr. Khan also checked boxes for both fair/poor in his rating of Ralston's ability to understand, remember, and carry out detailed job instructions. Tr. 553.

condition. Tr. 42. He stated that he had problems with shortness of breath and couldn't walk long distances. Tr. 44. After resigning from his job as a corrections officer he stated that he moved to Las Vegas and didn't work for two years. Tr. 58. He testified that, after that time, he became a security supervisor for Fashion Show Mall. Tr. 58-59. He stated that he didn't really sit down at the job but drove a car a lot. Tr. 59.

Ralston testified that after he left the security job, he had a "palimony job" but was let go and began to collect unemployment compensation. Tr. 60. Ralston stated that while he was receiving unemployment benefits he looked for work as a security guard or tow motor operator. Tr. 60-62. He stated that he obtained a couple of interviews during that time and had he been able to get a job he "probably would have took it." Tr. 62-63.

Ralston testified that he uses a cane to help him walk because of his lightheadedness. Tr. 48-49. He stated that it was suggested, but not prescribed, by his doctor. Tr. 56. He testified that his medication helps with his lightheadedness but does not completely eliminate it. Tr. 49-50. He further testified that his back pain prevents him from being on his feet for very long. Tr. 51. Ralston stated that he experiences chest pains two to three times a week. Tr. 54. When he was asked if he had any problems with his hands, Ralston replied, "No." Tr. 64. He testified that he can wash dishes and shop but needs help lifting anything over 15 pounds or doing anything strenuous. Tr. 46-48.

### 2. Vocational Expert's Testimony

Vocational Expert Robert Brezinski ("VE"), testified at the hearing. Tr. 66- 74. The VE testified to the exertional and skill level of Ralston's past work: security guard (light, semi-skilled); extreme machine operator (performed as light work, semi-skilled); forklift operator (medium, semi-skilled). Tr. 71-72. The ALJ then asked the VE whether there were any jobs in

7

the national or regional economy for a hypothetical individual of Ralston's age, education, and employment background limited to light exertional work who can frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently kneel and crouch; occasionally crawl; must avoid concentrated exposure to irritants, such as fumes, odors, dust, gases, and poorly ventilated areas; must avoid all exposure to hazards, such as operational control of moving machinery and unprotected heights.  Tr. 73.  The VE testified that such a hypothetical individual could perform Ralston's past work as a security guard.  Id.  The ALJ then asked if there were other jobs in the national economy such an individual would be able to perform.  Id. The VE testified that such an individual could also perform work as a small products assembler (5,000 Ohio jobs; 200,000 national jobs); electronics worker (4,000 Ohio jobs; 160,000 national jobs); and an inserting machine operator (1,000 Ohio jobs; 50,000 national jobs).  Tr. 73-74.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[6] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

---

[6] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his February 24, 2012, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.  Tr. 17.

2. The claimant has not engaged in substantial gainful activity since March 14, 2008, the alleged onset date.  Tr. 17.

3. The claimant has the following severe impairments:  cardiomyopathy, hypertension, and degenerative disc disease.  Tr. 17.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[7]  Tr. 18.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can frequently climb ramps and stairs; cannot climb ladders, ropes, or scaffolds; can frequently balance, kneel, or crouch; can occasionally stoop or crawl; must avoid concentrated exposure to excessive vibration; must avoid concentrated exposure to hazards such as fumes, odors, dusts, gases, and poorly ventilated areas; and must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights.  Tr. 18-19.

6. The claimant is capable of performing past relevant work as a security guard.[8]  Tr. 22.

7. The claimant has not been under a disability, as defined in the Social Security Act, since March 14, 2008, through the date of this decision.  Tr. 23.

---

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[8] The ALJ also noted, in the alternative, that "considering claimant's age, education, work experience, and RFC, there are other jobs that exist in the national economy that the claimant also can perform."  Tr. 22.

### V. Parties' Arguments

Plaintiff argues that the ALJ erred in assigning little weight to the opinions of his treating physician, Dr. Khan.  Doc. 18, pp. 10-16.  Plaintiff also contends that the ALJ erred in evaluating his credibility.  Id. at pp. 16-19.  In response, the Commissioner argues that substantial evidence supports the ALJ's decision.  Doc. 19, pp. 8-11.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

#### A.  The ALJ gave appropriate weight to the opinions of Dr. Khan

Ralston argues that the ALJ inappropriately gave "little weight" to the opinions of his treating physician, Dr. Mohammad Khan.  Doc. 18, p. 10.  Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

11

Conversely, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *2 (July 2, 1996)).

On February 16, 2011, Dr. Khan completed both a physical and mental medical source statement ("MSS"). Tr. 550-53. In his physical MSS, Dr. Khan opined that Ralston's ability to lift, carry,[9] reach, handle, feel, push/pull, and perform fine and gross manipulation would be affected by his cardiomyopathy. Tr. 550-51. Dr. Khan also opined that Ralston could only stand/walk for up to 2 hours in an 8-hour work day because of "shortness of breath." Id. Finally, Dr. Khan opined that Ralston could rarely or never climb, crouch, kneel, and crawl; and could only occasionally balance and stoop. Tr. 550. In his mental MSS, Dr. Khan opined that Ralston could not maintain regular attendance and would have a poor ability to function independently without supervision or to deal with work stresses. Tr. 552. Dr. Khan supported his mental health assessment by stating that Ralston has a "poor ejection fraction" due to his cardiomyopathy. Tr. 553.

The ALJ did not give controlling weight to the opinions of Dr. Khan because the ALJ determined that the opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with other evidence in the record. Tr. 21. The ALJ noted that Dr. Khan's opinions "are not based on objective evidence since hand limitations are noted but there is no evidence of any hand problems in the record" and the opinions "seem[] to be based on the claimant's subjective complaints, which I do not find particularly credible" Tr. 21. The ALJ correctly notes that there is no evidence of any hand

---

[9] Dr. Khan did not specify how much or how frequently Ralston could lift or carry. Id.

12

problems in the treatment notes. Id. In fact, to the contrary, when Ralston was asked at the hearing if he had any problems with his hands, he replied "No." Tr. 64. Further, with respect to Dr. Khan's psychological MSS Plaintiff was not diagnosed with any mental health impairments, was not treated for any mental health impairments, and there are no symptoms regarding Ralston's mental health in the treatment notes that would support Dr. Khan's assessment. Accordingly, the ALJ appropriately denied controlling weight to Dr. Khan's opinions. Id.

If an ALJ does not give a treating source opinion controlling weight, then the ALJ must weigh the opinion based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *Id.* § 404.1527(c)(2)-(6). The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996).

The ALJ assigned "little weight" to the opinions of Dr. Khan but provided good reasons for doing so which are supported by substantial evidence. The ALJ discounted Dr. Khan's opinions because he is not a specialist in cardiology or psychology; the opinions were not supported by relevant evidence; and were inconsistent with the record as a whole. Tr. 21.

Dr. Khan appeared to support most of his physical MSS findings based on Ralston's heart condition/cardiomyopathy. The ALJ noted that Dr. Khan is not a cardiologist and, therefore, not a specialist with respect to Ralston's heart condition Tr. 21. Similarly, the ALJ pointed out that

13

Dr. Khan is not a psychiatrist and, therefore, stated that his mental MSS findings were of limited relevance.  Id.  Dr. Khan was Plaintiff's primary care physician, not a specialist.  Ralston agrees that specialization is an appropriate factor to consider under §404.1527 but argues that "Plaintiff's cardiologist is in agreement with Dr. Khan as to Plaintiff's physical limitations."  Doc. 18, p. 13.  Notably, Ralston does not provide any citation to the record for this claim.  To the contrary, Ralston's cardiologist, Dr. Quan, stated two months after Dr. Khan's medical opinions were issued that  "Overall, [Ralston] is able to do whatever activity he wants without any significant symptoms" but that "[i]f he does heavy exertion, he may become short of breath."  Tr. 608.  Therefore, the ALJ appropriately considered Dr. Khan's lack of specialization as a factor in discrediting his opinions, particularly when Ralston's cardiac specialist contradicted that opinion.

     Additionally, the ALJ noted that Dr. Khan's opinion appeared to be based on Ralston's subjective complaints rather than objective tests and there was inconsistent evidence in the record.  Tr. 21.  For example, the treatment notes do not reveal any objective tests performed by Dr. Khan related to standing or walking.  Dr. Khan stated that his assessment that Ralston could only walk for up to 2 hours was based on Ralston's "shortness of breath." Tr. 550.  It is true that Ralston at times complained of shortness of breath but he also frequently stated that he was not experiencing shortness of breath.  Tr. 485, 513, 591, 705.  Furthermore, Dr. Quan's statement that Ralston can perform any activity without significant symptoms but becomes short of breath at "heavy exertion" also supports the ALJ's finding that Dr. Khan's opinion was not supported by objective testing and was inconsistent with other evidence.  Tr. 608.

     The ALJ also found that Ralston's testimony regarding his work as a security guard supported the conclusion that he was able to work despite his alleged impairments.  Tr. 21.

14

Ralston testified that he resigned as a corrections officer in 2004 due to his heart condition and internal bleeding.  Tr. 42.  However, Ralston also testified that he subsequently looked for work and even performed work as a security guard.  Tr. 42-43.  In a work history report, Ralston confirmed that, after he resigned from his corrections job, he held three positions as a security guard that required him to walk/stand all day and sit for no more than 30 minutes in a work day.[10]  Tr. 202-204.  After he was laid off of his most recent job, Ralston continued to look for work as a security officer or tow motor operator during his alleged period of disability.  Tr. 61-62.  The above information is inconsistent with Dr. Khan's finding that Ralston could stand/walk for no more than 2 hours in a work day.

Dr. Khan's opinions were also inconsistent with the opinions of the state agency consultants, Dr. Albert and Dr. Manos.  The ALJ gave great weight to the opinion of Dr. Albert, which was affirmed by Dr. Manos, because the ALJ found that the opinion was "consistent with and supported by the record when considered in its entirety."  Tr. 21-22.  Dr. Albert opined that Ralston could perform light work and found no manipulative (hand) limitations.  Tr. 359-61.  Dr. Albert further opined that Ralston could frequently climb stairs and ramps, balance, crouch, and kneel; occasionally stoop and crawl; and never climb ladders, ropes, or scaffolds.  Tr. 360.  The ALJ adopted these limitations in the RFC.  Tr. 18-19.  The opinions of state agency doctors are entitled to consideration under the same regulations used to assess other medical opinions, and may in some circumstances be entitled to greater weight than the opinions of treating or examining sources.  20 C.F.R. § 416.927(e); SSR 96-6p; *Combs v. Comm'r of Soc. Sec.*, 459

---

[10] Although these positions appear to have been performed prior Ralston's alleged 2008 disability onset date, his performance of these jobs lends credence to the ALJ's finding that such work undermines his claims with regard to the severity of his impairments.  This is true because Ralston claims that he had to resign from the corrections position in 2004 due to the severity of the same impairments he currently claims are work preclusive but acknowledges that he continued to perform work that required continuous standing and walking after his 2004 resignation.

15

F.3d 640, 651 (6th Cir. 2006) (en banc) (affirming the ALJ's decision adopting a reviewing physician's opinion over a treating physician's opinion).

Finally, Dr. Khan's mental health MSS is not supported by any evidence in the record. There are no treatment notes that would support a claim that Ralston cannot tolerate work stresses, function independently without special supervision, or remember and carry out detailed job instructions. Tr. 552-53. The only support Dr. Khan lists for these findings is "poor ejection traction" due to "cardiomyopathy." Tr. 553. However, Dr. Khan does not explain how Ralston's heart condition would impact these functions and Ralston was never diagnosed with or treated for any mental health impairments. In addition, the treatment notes do not indicate any mental health symptoms that would support these findings.

For all of the reasons discussed above, while the ALJ gave little weight to Dr. Khan's opinions, the ALJ provided "good reasons" for doing so which are supported by substantial evidence in the record and are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). Judicial review is limited to "whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied." *Elam ex rel. Golay v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir.2003); *Castello v.Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610590 (N.D. Ohio Jan. 10, 2011) *report and recommendation adopted sub*

*nom. Castello ex rel. Castello v. Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610138 (N.D. Ohio Feb. 10, 2011). Accordingly, the ALJ did not err by giving less weight to the opinions of Dr. Khan.

**B. Credibility**

Next, Ralston argues that the ALJ erred under relevant case law and Social Security Ruling 96-7p in assessing his credibility. Doc. 18, pp. 16-19. The ALJ's credibility determinations are entitled to great deference because the ALJ had the "unique opportunity to observe" the witness's demeanor while testifying. *Buxton v. Halter,* 246 F.3d 762 at 773; *Jones v. Comm'r of Social Sec.,* 336 F.3d 469, 476; *Walters v. Comm'r of Social Sec.,* 127 F.3d 525, 531. On appeal, a reviewing court is "limited to evaluating whether or not the ALJ's explanations for [discrediting the witness] are reasonable and supported by substantial evidence in the record." *Jones,* 336 F.3d at 476. In determining the credibility of the individual's statements, the ALJ must consider the following factors:

    1. The individual's daily activities;

    2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

    3. Factors that precipitate and aggravate the symptoms;

    4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

    5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

    6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

    7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7P *3 (July 2, 1996). One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. *Id.* at *4.

Here, the ALJ stated that Ralston's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they are inconsistent with the RFC. Tr. 19. The ALJ stated that, with respect to Ralston's heart problem, hypertension, and back impairments, the evidence does not support the extreme limitations testified to by Ralston. Tr. 19-20. Further, the ALJ noted that Ralston's testimony regarding his work and unemployment after the alleged onset date undermines his credibility:

> The claimant testified that he did some work as a security guard after the alleged onset date.[11] He also testified that he collected unemployment after the alleged onset date and was actively looking for work as a security guard or a tow motor operator (Hearing Testimony). This testimony supports the conclusion that the claimant is able to work despite his allege impairments.

Tr. 21.

Ralston argues that the ALJ erred by discrediting his complaints due to his testimony regarding his work and unemployment benefits. Doc. 18, pp. 16-19. Ralston claims that the ALJ cannot discredit him simply for looking for work and collecting unemployment but must discredit him based on inconsistencies. Id. At the hearing, Ralston testified that he collected unemployment in 2010 through 2011 when "it ran out."[12] Tr. 60-61. He stated that during the period he was collecting unemployment, he looked for work as a security officer or tow motor

---

[11] It is not clear from the record whether Ralston completed any work as a security guard after the alleged onset date. However, Ralston completed work as a security guard after his 2004 resignation as a corrections officer and Ralston stated that he had to quit his corrections position due to his disability. Tr. 42. Further, Ralston continued to look for work as a security guard after his alleged onset date. Tr. 61-62.

[12] The record confirms that Ralston received unemployment benefits from the fourth quarter of 2009 through the second quarter of 2011. Tr. 169-172, 183-184.

18

operator.  Tr. 61-62.  Ralston further testified that he obtained a few interviews for tow motor operator positions and stated, "if I was able to get the job I probably would have took it."  Tr. 63.

The Sixth Circuit has held that a claimant's receipt of unemployment benefits is "inherently inconsistent" with seeking disability benefits and an ALJ can consider this inconsistency in determining the claimant's credibility.  *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801-02 (6th Cir. 2004) ("Applications for unemployment and disability benefits are inherently inconsistent."); *See also Bowden v. Comm'r of Soc. Sec.,* No. 97–1629, 1999 WL 98378, at *7 (6th Cir. Jan. 29, 1999) (There is "no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.").  Thus, the ALJ did not err by considering Ralston's testimony relating to his work and unemployment benefits as a factor in his credibility analysis.

Moreover, the ALJ did not rely exclusively on Ralston's testimony relating to his work and unemployment compensation benefits to support his finding that Ralston's testimony was "not entirely credible."  The ALJ also found that the record does not support the extreme limitations testified to by Ralston with respect to his heart problem, hypertension, and back impairments.  The ALJ's decision contains an in-depth analysis of the medical records relating to these impairments. Tr. 19-20.  For example, the ALJ noted that the evidence does not support Ralston's allegations as to the debilitating nature of his hypertension.  Tr. 20.  The ALJ pointed out that, although Ralston had high blood pressure readings around April 2011, as of October 2011 and January 2012 his hypertension had generally been well-controlled.  Tr. 20.  Further, Ralston testified that he suffered from chest pain two to three times a week due to his heart problems (Tr. 54-55) but, as the ALJ pointed out, objective evidence revealed a stable heart and

19

in June 2011, Ralston's treating physician stated that his chest pain was likely musculoskeletal in origin.  Tr. 19-20, 596.

Considering all of the above, the ALJ's review of Ralston's credibility was reasonable and supported by substantial evidence. In this case, the evidence in the record was conflicting and required the ALJ to make a credibility determination. Because the ALJ provided specific explanations for his credibility finding, and because his finding was within the zone of reasonable choices, his denial of Ralston's application for benefits must be affirmed. *See Buxton, 246 F.3d at 773*.

### VII.  Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  August 4, 2014

Kathleen B. Burke
United States Magistrate Judge